FILED

2024 Jul-08  AM 10:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| ROBERT TAYLOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case No.  5:22-cv-01350-HNJ |
| | ) |
| CHRISTINE E. WORMUTH, | ) |
| Secretary, Department of the Army, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

*Pro se* Plaintiff, Robert Taylor, an employee of the Army Contracting Command at Redstone Arsenal in Huntsville, Alabama, asserts claims against Christine E. Wormuth, the Secretary of the Department of the Army, for race-based disparate treatment, race discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964, *et seq.*, as amended (Title VII).[1]  Defendant moved for summary judgment on all of those claims.  (Doc. 44).

---

[1] Taylor's Complaint asserted a claim for wage discrimination pursuant to the Equal Pay Act.  (Doc. 1).  On April 25, 2023, the court dismissed that claim for failure to state a claim upon which relief can be granted.  (Doc. 20).

Taylor's Complaint and summary judgment brief allude to 42 U.S.C. § 1981.  (Doc. 1-2, at 1, 20; Doc. 49, at 1-2, 14, 16-18, 30).  "Section 1981 provides a cause of action for individuals subjected to discrimination by private actors and discrimination under color of state law, but does not provide a cause of action for discrimination under color of federal law."  *Lee v. Hughes*, 145 F.3d 1272, 1277 & n.5 (11th Cir. 1998); *see also Johnson v. U.S. Sec'y of Army*, No. 23-10454, 2024 WL 304006, at *1 (11th Cir. Jan. 26, 2024) (quoting *United States v. Timmons*, 672 F.2d 1373, 1380 (11th Cir. 1982)) ("[W]e have long held that 'the United States has not waived its immunity to suit under' § 1981."); *Johnson v. United States, Dep't of Just.*, 694 F. App'x 748, 749 (11th Cir. 2017) (citing *Lee*, 145 F.3d at 1277) ("[A] plaintiff cannot maintain a § 1981 claim against a federal agency or official.").  Accordingly, the court will consider

For the reasons stated herein, the court concludes Taylor did not timely exhaust his claims for race discrimination arising from the denial of resources, and he has not presented sufficient evidence of race-based disparate treatment, race discrimination, or retaliation.   Accordingly, the court will grant Defendant's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The

> "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

---

Taylor's discrimination and retaliation claims under Title VII, not under 42 U.S.C. § 1981.

Taylor's brief also references the Equal Protection Clause of the U.S. Constitution.  (Doc. 49, at 17-18).  The Fifth Amendment accords equal protection under federal law. *United States v. Osorto*, 995 F.3d 801, 810 (11th Cir. 2021) (citing *Hampton v. Wong,* 426 U.S. 88, 100 (1976)).  However, Taylor cannot proceed with a claim under the Equal Protection Clause because he did not plead such a claim in his Complaint, and he cannot raise the claim for the first time in response to Defendant's motion for summary judgment.  *See Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 150 (11th Cir. 2021) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)) ("[I]t is improper for a plaintiff to raise new claims through briefs opposing summary judgment.").

Even if Taylor could proceed under 42 U.S.C. § 1981 or the Equal Protection Clause, those causes of action require "the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 . . . ." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018) (citing *Bryant v. Jones*, 575 F.3d 1281, 1296 n.1 & 20 (11th Cir. 2009)).  Thus, any such claims would fail for the same reasons Taylor's Title VII claims fail.

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 577 U.S. 1139 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the

record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The movant merits summary judgment if the governing law on the claims or

defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## FACTS

Beginning on August 11, 2013, Plaintiff Robert Taylor, a Black person, worked as a Supervisory Management Analyst, pay grade NH-IV, for the Army Contracting Command at Redstone Arsenal in Huntsville, Alabama. (Doc. 44-2). On March 25, 2015, in anticipation of an upcoming Chief of Staff meeting, Taylor expressed concern in an email to his superiors that he did not have "a balanced support staff to effectively sustain the workforce." (Doc. 44-3, at 1).

During an April 18, 2017, meeting of division chiefs (Taylor's superiors), Taylor informed Rebecca Weirick, a Senior Executive Service (SES) official, and John Mayes, a deputy executive, that "headquarters" resisted his staffing requests, and his organization needed more resources to complete its mission. Taylor had lodged previous requests for additional human resources, but the April 18, 2017, request represented his "most vigorous" attempt to that point. (Doc. 44-4, at 5-6).

On May 22, 2017, Taylor sent an email to Colonel William Trimble, his supervisor, stating:

Attachment contains Support Operations workload analysis.  As indicated in our one on one meeting this morning, the playing field is not equal when compared to [Human Resources], Budget, and [Strategic Initiatives Group].

During our Division Chief brown bag luncheon with Mr. Mays [*sic*] and Mrs. Weirick, I informed them by losing 3 GS employees and 6 contractors for IT, it will greatly reduce our ability to effectively support the organization.

With current manpower, I am at risk by not having the required resources to effectively account for, issue, turn-in and store equipment which supports over 900 personnel scattered throughout 20 plus buildings.

Status-quo has an extremely high risk of a potential repeat of a Financial Liability Investigation of Property Loss.   HG-ACC G4 recommended during their last CSDP evaluation, we have separate hand receipts to sign for the warehouse for incoming, outgoing and property being turned-in.  Currently, all the risk is on me.  As such we received a RED rating (attached).  We do not have appropriate staffing to support our chartered mission.

We've come a long ways with property accountability but not close to what right supposed to look like. [sic]

It is my duty to be truthful with leadership.  We only want what's best for the organization without the risk being solely on one person. Request to be present if or when a request for additional resources is briefed.

(Doc. 44-6, at 1).

After sending the May 22, 2017, email, Taylor met with Col. Trimble, but his work unit did not receive any additional human resources.  Taylor continued to request additional resources every two to three months through July 2019, but no one granted

his requests.  (Doc. 44-4, at 7-8).

Dale Smith, the Budget Chief who is White, always received additional resources when he desired them.  On some unidentified date during the general time frame within which Taylor requested additional human resources, Smith received a slot for a new employee after one of Taylor's employees retired, even though Taylor desired the slot for his unit.  Taylor does not know whether Smith requested the additional employee, and he does not know how many employees Smith supervised.  (*Id.* at 8).

Sometime during 2018 and again in 2019, Taylor participated in EEO investigations involving complaints against Weirick and Mayes by other employees. Taylor could not recall the specific time frame of the 2019 investigation, but he confirmed it occurred "months" before September 3, 2019. During both investigations, Taylor provided written statements to an internal investigator supporting allegations of racial discrimination perpetrated by Weirick and Mayes.  (*Id.* at 12-13).  Taylor does not know whether Weirick or Mayes read his statements, but he presumes they did because most people would want to know if someone took action against them, and no other logical explanation exists for the treatment he endured.  (*Id.* at 14).  Taylor also does not know if Joseph Giunta, who replaced Weirick, read or had access to his statements. (*Id.*).

On September 3, 2019, Col. Trimble signed a form detailing Taylor from the position of Supervisory Management Analyst to the position of Strategic Planning

Officer, where Daniel Cottrell, Chief of Contracting Operations, would serve as Taylor's direct supervisor.  Both positions fell within the NH-IV grade level.  The detail notice stated Taylor should "cease performing all duties and functions" related to the Supervisory Management Analyst position.   Taylor signed the detail form, acknowledging he had "been placed on this detail not-to-exceed 120 days and can be extended or terminated at the discretion of management."  (Doc. 44-7, at 1).

Despite Col. Trimble's signature on the detail form as the supervisory official, Joseph Giunta, the Executive Director of the Army Contracting Command, testified he made the final decision to detail Taylor after Trimble initiated the detail.  (Doc. 44-8, at 3-4, 25; Doc. 48-3, at 19).  Taylor confirmed during his deposition that Giunta made the decision.  (Doc. 44-4, at 4).

Giunta based his decision on a series of reports describing a history of financial liability investigations of property loss (FLIPL's) within Taylor's work unit.  The reports depicted approximately $435,000 of lost or unaccounted-for property, in addition to other mislocated property and a surplus of property in storage. Moreover, the unit had not appropriately collected property receipts or conducted regular inventory checks.  Giunta also received reports of falsified property receipt documents.  Giunta requested Army Contracting Command Headquarters to initiate an investigation of the unit's internal processes, and he personally initiated another FLIPL.   (Doc. 44-8, at 16-23).

The investigations directly impacted Taylor because, in Giunta's words, Taylor "owns that branch, he's responsible for facilities and property, and he is the hand receipt holder, so indirectly, he's going to be looked at as part of that review, as with all of the other employees associated with that . . . ."  (*Id.* at 23).  Taylor asserts the position description for his position did not encompass responsibility for property accountability.  (Doc. 44-4, at 15).  The record does not contain a copy of the position description for the Supervisory Management Analyst position, but Giunta read from the description during his sworn testimony:

> Leads divisions and efforts to evaluate effectiveness and efficiency of program operations, organizational structure, functional alignment, and mission assignments throughout ACC RSA. . . .  designs, develops, institutionalizes automated information system support studies and analysis of complex resource for organizational structure issues. . . . Analyzes and evaluates the effectiveness of line program operations to include communication facilities and information technology.

(Doc. 44-8, at 34-35).

Giunta testified he detailed Taylor from the Supervisory Management Analyst position because he wanted to protect Taylor.  If the property management problems continued after Taylor no longer served as supervisor in that area, that would indicate to Giunta that Taylor did not act out of "malicious intent" in causing any property loss.  Giunta also believed Taylor's absence would facilitate solving the property accountability problem.  (Doc. 44-8, at 24-26).

Taylor contends he did not perform the work of a Strategic Planning Officer after the September 3, 2019, detail.  Though his employment paperwork recited that job title, the Strategic Planning Officer position should have entailed supervisory duties, and Taylor did not perform supervisory duties after September 3, 2019.  Rather, Taylor believed he performed the work of an Operations Specialist, a GS-14 position that fell at a lower grade level.  (Doc. 44-4, at 4).  Cottrell confirmed Taylor did not occupy a supervisory position when he began managing Taylor in September 2019.  (Doc. 48-2, at 29).

The detail also necessitated Taylor's physical relocation to the group that encompassed his new assignment, which occasioned a move in the same building approximately 100 feet away from his former location.  In the new location, Taylor worked in an open cubicle, whereas in his former location he worked in a hard-walled office.  (Doc. 44-4, at 8-9).  Giunta testified he had no influence over the physical location of Taylor's desk after the detail change.  (Doc. 44-8, at 28).  Taylor's salary did not change as a result of the detail, but if the detail remained permanent, it would reduce his future earning potential by capping his salary at a lower amount.  (Doc. 44-4, at 12).  The record indicates Taylor continues to serve in the detail he commenced on September 3, 2019.

The Army assigned another Black male, John Landry, to the Supervisory Management Analyst position Taylor formerly occupied when Giunta detailed him to

10

the Strategic Planning Officer position in September 2019. (Doc. 44-8, at 29-32). Taylor acknowledged during his deposition that the Army assigned Landry to his former position. (Doc. 44-4, at 15). Confusingly, Taylor also testified that a "white individual," Dale Aaknes, took over his position. (*Id.*). However, the organizational charts Taylor filed depict that, as of September 30, 2019, John Landry occupied the top position in the division "CCAM-BMS," which equates to the same position Taylor occupied as of October 9, 2018. (Doc. 48-4, at 1-2). Lieutenant Colonel Tangela Robinson, a Black woman, occupied the position as of the September 29, 2020, Organizational Chart. (*Id.* at 3; Doc. 48-2, at 42). Aaknes's name does not appear in the position until the September 30, 2021, Organizational Chart (Doc. 48-4, at 4), and it remains on the May 18, 2022 (*Id.* at 5), and October 3, 2022, charts. (*Id.* at 6). The organizational charts depict that the "CCAM-BMS" division (which underwent restructuring in 2021 to become "CCAM-BMC-S") employed 14 people in 2018, 20 people in 2019, 22 people in 2020, 22 people in 2021, 20 people in 2022, and 20 people in 2023. (*Id.* at 1-6).

Taylor testified the Army did not detail two White female supervisors, LaVanna Grantham and Tammy Williams, while they underwent investigations. Grantham faced an accusation that she hired her husband to work within her organization, but Taylor does not know the reason for the investigation of Williams. Taylor testified the Army investigated but did not detail a total of 12 White supervisors, but he did not provide any names other than Grantham and Williams, or any details about other investigations.

Taylor identified one non-supervisory White female employee, Jody Byrd, who "was caught stealing several times during duty hours and was never moved while under investigation and was later offered a supervisory position." (Doc. 44-4, at 9-11).

In contrast, the Army moved four Black supervisors (Virginia Walker, Bridgett Helem, Dexter Hornsby, and Earl Adam) and one Hispanic supervisor (Cristina Rodriguez) during investigations. Taylor did not provide the time frame for these other investigations. He recalled the investigations of Adam and Rodriguez involved improper awards to subordinate employees, but he did not know the reasons for the other investigations. (*Id.* at 11-12).

On September 23, 2019, Taylor initiated contact with his agency's Equal Employment Opportunity (EEO) office. (Doc. 44-9, at 2; Doc. 44-4, at 3). On November 20, 2019, Taylor filed a Formal Complaint of Discrimination with the EEO office. (Doc. 44-9, at 2; Doc. 44-4, at 3). Taylor's Formal Complaint alleged discrimination on the basis of race (African-American), color (Black), sex (Male), age (56), national origin (USA/MS), religion (Baptist), and disability (anxiety and difficulty walking).

To support those allegations, Taylor declared:

> I. I was treated unfairly on 3 September 2019 when I was removed from my position of record as a Supervisory Management Analyst position (NH-343-04) to a non-supervisory Operations Officer position (GS-301-14) while Mr. John Mayes, Ms. Janet Guyette and Mr. Dale Smith, who are all white, were under investigations, and remained in their

position of record as NH-04 in the same office without moving.  Ms. Jody Byrd (white) arrested (at least twice for stealing) [*sic*] remained in her position of record as a non-supervisor.

II.  I was treated unfair [*sic*] when at 1630 on 3 September 2019 I was not given proper time to clean out my office to move to cubical space while Mr. Mayes, Ms. Guyette and Mr. Smith (all white) were not moved when they were under investigation.

III.  I was treated unfair [*sic*] when a younger black employee with no visible disability issues replaced me during the investigation. (Disability/age discrimination).

IV.  All of the above created a hostile work environment in which has made it almost impossible to work in.  [*sic*]

(Doc. 44-9, at 1).

Taylor requested $300,000 in compensatory damages, attorney fees, assignment to a position of increased responsibility, and reimbursement for all sick days he used because of work-based stressors.  He also requested his employer "[p]rovide training programs within the organization to ensure all people are treated the same regardless of their physicality and remove those who violates [*sic*] Title VII of the Civil Rights Act of 1964."  (*Id.* at 2).

On July 28, 2022, the EEO office issued a final action on Taylor's November 20, 2019, complaint.  (Doc. 1-1).  The final action document recounted that an EEOC Administrative Judge had granted the agency's motion for summary judgment and issued a decision finding no discrimination.  The EEO office decided to implement the Administrative Judge's decision.  (*Id.* at 2).  The document also informed Taylor of his

right to file a Notice of Appeal with the Equal Employment Opportunity Commission (EEOC) within 90 days of receipt of the final action, and to file a federal lawsuit within 90 days of receiving the EEOC's final decision on appeal.  Alternatively, in lieu of an appeal to the EEOC, Taylor could file a federal lawsuit within 90 days of receiving the final agency action.  (*Id.* at 2-4).

Taylor filed this case on October 21, 2022.  (Doc. 1).

## DISCUSSION

Taylor asserts Defendant engaged in race discrimination, race-based disparate treatment, and retaliation when it denied him adequate human resources to staff his work unit, thereby setting him up to fail professionally, and when it detailed him to a different position on September 3, 2019.  As discussed herein, Taylor has failed to produce sufficient evidence of race discrimination or retaliation.  Accordingly, the court will grant summary judgment in Defendant's favor on all claims.

**I.    Taylor May Have Timely Exhausted His Administrative Remedies for the Discrimination Claim Based Upon the Denial of Resources, Yet He Did Not Produce Sufficient Evidence of Race Discrimination Regarding Either the Denial of Resources or the September 3, 2019, Detail Decision.**

Title VII of the Civil Rights Act protects federal employees from race and color discrimination by providing that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any

discrimination based on race[ or] color. . . .").  42 U.S.C. § 2000e-16(a).[2]

> "[T]he 'free from any discrimination' language means that personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199 (11th Cir. 2021) ("*Babb II*") (quoting *Babb v. Wilkie*, 589 U.S. 399, 406, 140 S. Ct. 1168, 206 L. Ed. 2d 432 (2020) ("*Babb I*")). So "a federal employer violates [Title VII] if it allows race [or national-origin] discrimination to contribute to any personnel action," even if that discrimination was not the but-for cause of the ultimate decision. *Buckley*[ *v. Sec'y of Army*], 97 F.4th [784,] 793[ (11th Cir. 2024)].

*Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351-52 (11th Cir. 2024) (second and third alterations in original); *see also id.* at 1352 (citing *Babb II,* 992 F.3d at 1199) (A federal employee "can substantiate a Title VII violation if []he shows that . . . discrimination 'tainted' the hiring process, even if it was not the but-for cause of [his] non-selection.").

The Eleventh Circuit maintains that the full *McDonnell-Douglas* burden-shifting framework used to assess circumstantial evidence in Title VII discrimination suits brought by private-sector plaintiffs does not "continue[] to make sense in *Babb I* and *Babb II*'s wake."  *Buckley,* 97 F.4th at 794.  As the Court explained, *McDonnell-Douglas* requires a plaintiff to establish a prima facie case of discrimination, then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the

---

[2] "By contrast, Title VII's private-sector provision prohibits personnel action against an employee 'because of such individual's race, . . . national origin,' or other protected characteristic." *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351 (11th Cir. 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)).

employment decision, then shifts the burden back to the employee to establish the employer's proffered reason constituted a mere pretext for discrimination. As such, "under the *McDonnell-Douglas* framework, the plaintiff bears the ultimate burden to show that discrimination was the but-for cause of her employer's adverse personnel action." *Id.*

As federal employees do not need to establish but-for causation to press a claim for discrimination, requiring them to satisfy *McDonnell-Douglas* would force "the plaintiff to move a boulder when []he need only push a pebble . . ." *Id.* Rather, a court adjudicating a federal employee's race discrimination claim must "simply assess whether [the employee] has proffered evidence that [his] race "play[ed] *any* part" in the [Defendant's] decision-making process." *Id.* at 795 (citing *Babb I*, 589 U.S. at 406) (third alteration and emphasis in original).[3]

---

[3] Even if a plaintiff satisfies that standard, he "is not necessarily entitled to all remedies under § 2000e-16(a)," as statutory "'relief must redress' the precise injury that the alleged discrimination 'inflicted.'"). *Terrell,* 98 F.4th at 1352 (citing *Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11ᵗʰ Cir. 2024)).

> Specifically, if [the plaintiff] proves that race or national-origin discrimination was (or both were) a but-for cause or causes of [his] non-selection, []he may be entitled to retrospective relief, like compensatory damages and back pay. *See* [*Buckley,* 97 F.4th at 794]. On the other hand, if [he] proves only that discrimination "tainted" the hiring process but not that it was a but-for cause of [his] non-selection, []he is not entitled to damages stemming from [his] non-selection. Rather, the court "begin[s] by considering injunctive or other forward-looking relief." *Id.* (internal quotation marks omitted) (quoting [*Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 n.8 (11ᵗʰ Cir. 2021) ("*Babb II*")].

*Terrell*, 98 F.4th at 1352 (final alteration in original).

Taylor asserts he experienced race discrimination and race-based disparate treatment[4] when Defendant denied him adequate resources to perform the requirements of his job, and when Defendant detailed him to a new position on September 3, 2019, resulting in humiliation and loss of earning potential.  (Doc. 44-4, at 15).

### A.    Taylor May Have Timely Exhausted His Administrative Remedies for Discrimination Claims Based Upon the Denial of Resources, Yet He Did Not Produce Sufficient Evidence of Race Discrimination in the Denial of Resources.

Taylor testified Defendant's denial of adequate human resources constituted race-based discrimination because Dale Smith, a White Budget Chief, received additional human resources whenever he desired them, including receiving a slot for a new employee though Taylor desired retention of the slot for his division after one of his employees retired.

Defendant asserts Taylor failed to timely exhaust his administrative remedies with respect to his denial of resource claims.  A federal employee asserting claims of employment discrimination "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action,

---

[4] Taylor's Complaint asserted separate claims for race discrimination and race-based disparate treatment.  However, during his deposition, Taylor testified the same events (allegedly not receiving sufficient resources and the September 3, 2019, detail) underlie both claims.  (Doc. 44-4, at 14-15). Accordingly, and because the legal elements of both claims overlap, the court will consider the claims together.

within 45 days of the effective date of the action."   29 C.F.R. § 1614.105(a)(1).[5]

"Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies."   *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (citing *Brown v. Snow*, 440 F.3d 1259, 1264-65 (11th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

As Taylor initiated contact with the EEO office on September 23, 2019, he could timely complain of conduct that occurred within the preceding 45 days, or on or after August 9, 2019.  To the extent he initiated an EEO complaint more than 45 days after Defendant denied his last request, he did not exhaust his administrative remedies, and the time bar would preclude any claims based upon the denial of additional resources because they constituted discrete employment actions.   However, although Taylor testified he last requested additional resources in July 2019, neither he nor Defendant provided the date on which Defendant denied his last request, or the date on which

---

[5] An agency may extend the 45-day time limit if

> the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known [*sic*] that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2).  The record does not reveal Taylor bade the agency to extend his filing deadline, or that any circumstances existed to warrant an extension.

Defendant treated a White supervisor more favorably.  *See Green v. Brennan*, 578 U.S. 547, 554 (2016) (cleaned up, citations omitted) ("Ordinarily, a limitations period commences when the plaintiff has a complete and present cause of action. . . .  A cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief.").    Therefore, Defendant cannot sustain the motion for summary judgment on this basis.[6]

---

[6] The court notes, however, that even if Taylor cannot assert a timely discrete claim based upon the denial of resources, facts surrounding the denial of resources may bear relevance as background information for Taylor's claims about the September 3, 2019, detail. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").

Taylor may also claim Defendant's denials of his requests for resources constituted a continuing violation, as he continued to experience a lack of adequate resources on an ongoing basis, continuing into the limitations period.

Under the continuing-violation doctrine, a plaintiff may "sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Doe ex rel. Doe v. Swearingen*, 51 F.4th 1295, 1305 (11th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)).  For instance, "[i]f a defendant's actions violate a plaintiff's rights on a repeated or ongoing basis, then a cause of action may be timely even if the first violation took place outside the statute of limitations." *Id.*

But we apply that doctrine only in limited circumstances. We "distinguish[ ] between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does." *Id.* (alteration in original) (quoting *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993)).  The continuing-violation doctrine applies in only the second scenario.  And the continuing-violation doctrine similarly does not apply when a plaintiff alleges "a series of repeated violations that result in repeated harms." *Id.* at 1306 (citing *Morgan*, 536 U.S. at 113, 122 S. Ct. 2061).  In those cases, "each new violation" starts the clock on its own limitations period. *Id.*

Even if Taylor timely asserted claims based upon the denial of resources, those claims fail on the merits.

Taylor argues Defendant treated a White comparator, Smith, the Budget Chief, more favorably than it treated him, and he evokes the prima facie case standard of the *McDonnell-Douglas* burden-shifting framework. The prima facie case standard requires a plaintiff to demonstrate: (1) "belongs to a protected class," (2) "was subjected to an adverse employment action," (3) "was qualified to perform the job in question," and (4) "[the plaintiff's] employer treated 'similarly situated' employees outside [his] class more favorably." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023) (cleaned up). "The last requirement is met when the plaintiff presents 'evidence of a comparator — someone who is similarly situated in all material respects.'" *Id.* (quoting *Jenkins v. Nell,* 26 F.4th 1243, 1249 (11th Cir. 2022)).

The Eleventh Circuit recently clarified in an unpublished opinion that a federal employee still must satisfy a prima facie case of discrimination, including presenting comparator evidence, even after *Babb I* and *Babb II.* According to the Court, those two

---

*Wainberg v. Mellichamp*, 93 F.4th 1221, 1227-28 (11th Cir. 2024) (alterations in original).

Absent argument from the parties on this point, the court declines to determine whether Defendant's alleged denials of resources represent a series of repeated violations that result in repeated harms, each with its own limitations period, or the continuation of a previous violation or violations into the present. As discussed, even if Taylor timely asserted claims based upon the denial of resources, his claims fail on the merits.

Supreme Court opinions

> concerned the second and third steps of [the *McDonnell-Douglas*]
> framework — that the defendant [must] articulate "a legitimate,
> nondiscriminatory reason for its actions" and, then, for the plaintiff to
> demonstrate that the "proffered reason was merely a pretext for unlawful
> discrimination," *see Lewis*[ *v. City of Union City*], 918 F.3d [1213, 1220-21
> (11th Cir. 2019) (*en banc*) ("*Lewis I*")] — which established a "but-for
> causation" requirement that has now been disapproved by the Supreme
> Court and this Court.  But a federal sector employee alleging Title VII . .
> . must still establish a *prima facie* case that a decision was not "made free
> from any discrimination," and neither *Babb I* nor *Babb II* suggested that
> the comparator analysis in *Lewis I* is inappropriate under the new
> standards. *See Babb I*, 140 S. Ct. at 1171-76; *Babb II*, 992 F.3d at 1198-1209.

*Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at *10 (11th Cir. June

30, 2022) (*Lewis II*).

Furthermore, after the *Babb* decisions other Eleventh Circuit and district court

decisions, in cases involving federal-employee plaintiffs, evaluated comparator evidence

pursuant to the prima facie case standard.  *See Burke v. United States Postal Serv.*, No. 22-

12488, 2023 WL 8841352, at *2 (11th Cir. Dec. 21, 2023); *Troupe v. DeJoy*, 861 F. App'x

291, 294 (11th Cir. 2021) (*per curiam*); *Alcindor v. Dejoy*, No. 8:20-CV-1620-CEH-AEP,

2023 WL 5625491, at *5-8 (M.D. Fla. Aug. 31, 2023); *Msikita v. Vilsack*, No. 21-22155-

CIV, 2023 WL 2611201, at *6-7 (S.D. Fla. Mar. 23, 2023); *McHenry v. McDonough*, No.

1:20-CV-5064-CAP-JKL, 2023 WL 6065083, at *5 & n.6 (N.D. Ga. Feb. 24, 2023),

*report and recommendation adopted*, No. 1:20-CV-5064-CAP-JKL, 2023 WL 6065080 (N.D.

Ga. Apr. 3, 2023); *Rosado v. Toro*, No. 3:19-CV-1428-MMH-PDB, 2022 WL 17067390,

at *7, 11 (M.D. Fla. Nov. 17, 2022).

Pursuant to the approach undertaken in the afore-cited decisions, the inquiry ensues whether Taylor presented sufficient evidence to satisfy the Title VII prima facie case standard for race discrimination. The court concludes Taylor's evidence fails the prima facie case standard because he cannot prove another employee outside his protected class received more favorable treatment.[7]

The record contains scant information about alleged comparator Dale Smith, his position, or the needs of his work unit. The record reflects Smith served as a Budget Chief, which by itself does not indicate Smith occupied a role similar to Taylor's or worked in a unit with the same operational demands, policies, and processes as Taylor's unit. In elaboration, the record does not depict the size or personnel needs of Smith's

---

[7] As for the other elements of the prima facie case standard, Taylor clearly belongs to a protected class, as he alleges discrimination based upon his race. Moreover, the court can infer Taylor qualified for the Supervisory Management Analyst position because he occupied the position for more than six years prior to the detail. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999)) ("'[I]f a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position.'").

Whether Taylor suffered an adverse employment action would require a more complex appraisal. *See Henderson v. City of Birmingham, Alabama*, 826 F. App'x 736, 741 (11th Cir. 2020) ("An adverse employment action for purposes of Title VII discrimination is any action that has a negative impact on 'the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way.' . . . Typically, an adverse employment action will 'affect continued employment or pay — things like terminations, demotions, suspensions without pay, and pay raises or cuts — as well as other things that are similarly significant standing alone.'" (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam))). The court need not perform that analysis as Taylor has not provided evidence of a similarly situated comparator, or as discussed in text, any other circumstantial evidence of discrimination.

work unit.  The record also does not depict where Taylor's and Smith's work units fall on an organizational chart, or whether Smith and Taylor shared a common supervisor. *See Lewis I,* 918 F.3d at 1227-28 (court should evaluate whether an alleged comparator shared a supervisor with the plaintiff).  Finally, the record does not depict whether, when, or how often Smith requested additional employees, to whom he lodged his requests, or how many additional employees he received.  Thus, the record evidence does not suffice to prove Smith constituted a similarly situated comparator, and any different treatment Smith may have received does not give rise to an inference of race discrimination.  *See Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (declaring "'a plaintiff must show the purported comparator was directly comparable . . . in all material respects so as to eliminate other possible explanatory variables'" for alleged differential treatment, and performance of "distinct functions and types of work" precludes the existence of "'enough common factors'" requisite "'to allow for a meaningful comparison'") (citations omitted).

Even so,

a "failure to produce a comparator does not necessarily doom the plaintiff's case," as a plaintiff will survive summary judgment if []he "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," i.e., "a convincing mosaic of circumstantial evidence." [*Smith v. Lockheed-Martin Corp.,*] 644 F.3d [F.3d 1321,] 1328[ (11th Cir. 2011)] (quoting *Silverman*[*v. Bd. of Educ. of City of Chicago*], 637 F.3d [729,] 734[ 7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016))].

*Lewis II*, 2022 WL 2377164, at *11; *see also Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1198 (11ᵗʰ Cir. 2024) (quoting *Jenkins*, 26 F.4th at 1250-51) ("Certainly, in a convincing mosaic case, we may consider relevant evidence about similarly situated employees, even if those employees are not 'strict comparator[s]' at the prima facie stage.") (alteration in original).[8]   Taylor may form such a mosaic with "evidence that

---

[8] Taylor's brief states that his "allegations stem from a complex tapestry of events wherein he claims to have been singled out, marginalized, and subjected to disparate treatment based on his race." (Doc. 49, at 2).  Given Taylor's *pro se* status, the court will consider that statement to invoke the "convincing mosaic" theory.  *See Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at *11 (11ᵗʰ Cir. June 30, 2022) (*Lewis II*).

> As another district court has pointed out,
>
> there seems to be a conflict on the applicability of the convincing mosaic analysis. *Compare Lewis*, 2022 WL 2377164, at *10 (recognizing convincing mosaic as a possible theory even after *Babb*); *Troupe v. DeJoy*, 861 F. App'x 291, 294-95 (11ᵗʰ Cir. 2021) (same) *with Durr v. Sec'y of Dep't of Veterans Affs.*, [No. 21-12867,] 2022 WL 2315086, at *1 [(11ᵗʰ Cir. June 28, 2022)] (holding the convincing mosaic theory no longer applies to federal sector Title VII cases); *Durr v. Sec'y, Dep't of Veterans Affs. (Durr I)*, 843 F. App'x 246, 247 (11ᵗʰ Cir. 2021) (same).

*Ibeh v. Toro*, No. 3:20-CV-1184-HES-MCR, 2023 WL 6331584, at *11 (M.D. Fla. July 27, 2023).

This court questions the practical weight of this conflict.  The analysis of circumstantial evidence of discrimination under a "convincing mosaic" theory may differ little, if at all, from the post-*Babb* analysis of whether race played a part in the employer's decision-making process.  Both analyses assess the totality of available circumstantial evidence to discern discriminatory intent vis-à-vis pertinent employment actions.  *C.f., Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 951 (11ᵗʰ Cir. 2023) (Newsom, J., concurring) ("The convincing-mosaic standard, by contrast — despite its misleadingly florid label — is basically just Rule 56 in operation.  Quite unlike *McDonnell Douglas*, it actually asks the key question: Does the 'record, viewed in a light most favorable to the plaintiff, present a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker'? . . . Strip away the grandiloquence — after all, 'convincing mosaic of circumstantial evidence' just means 'evidence' — and that is *exactly* Rule 56's summary-judgment standard.") (citation omitted).

Thus, while the court should not use the convincing mosaic theory to discern whether discriminatory intent served as the but-for cause of an adverse employment action against a federal

demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins,* 26 F.4th at 1250 (quoting *Lewis II,* 934 F.3d at 1185).

Taylor has not offered any such evidence.  As discussed, the evidence regarding Smith and the Budget unit does not give rise to an inference of discriminatory intent. Absent any further detail about the relative roles of Taylor and Smith and the nature of their work units' operational demands, policies, processes, sizes, and staffing needs, the record does not even demonstrate Defendant treated Smith advantageously.  Taylor submitted organizational charts depicting the number of employees in his unit increased after he left it in September 2019.  However, those charts do not give rise to an inference of race-discrimination as two other Black individuals, John Landry and Tangela Robinson, succeeded Taylor, and staffing numbers increased under those individuals' supervision.

Taylor asserts Defendant set him up to fail in his position by providing him insufficient resources to accomplish his unit's mission.  However, even if Defendant knowingly failed to provide Taylor enough resources to succeed, there exists no

---

employee-plaintiff after the *Babb* decisions, it may apply the convincing mosaic theory to determine whether race played a role in any employment decisions affecting Taylor.  *See Ibeh,* 2023 WL 6331584, at 11 ("In an abundance of caution, this Court briefly addresses Ibeh's claim that he can establish a prima facie case with a convincing mosaic analysis.").

evidence racial animus influenced Defendant's actions.  As discussed, after the Agency detailed Taylor, the number of employees in his former unit increased under the supervision of Black supervisors. White employee Aaknes occupied the position and supervised more employees than Taylor, yet those circumstances occurred after Defendant had employed the Black individuals in the supervisory position.

Taylor's brief also alludes to other Black employees who have received unfavorable treatment, or to White employees who have received favorable treatment.[9] Many of these assertions impermissibly rest solely upon Taylor's representations in his opposition brief, not upon any record evidence  *See Helmich v. Kennedy*, 796 F.2d 1441, 1443 (11th Cir. 1986) ("Statements of fact in a party's brief, not in proper affidavit form, cannot be considered in determining if a genuine issue of material fact exists.") (citation omitted); *Am. Lease Plans, Inc. v. Silver Sand Co. of Leesburg*, 637 F.2d 311, 314 (5th Cir. 1981) ("'[W]when a movant makes out a convincing showing that genuine issues of facts are lacking, we require that the adversary adequately demonstrate by receivable facts that a real, not formal, controversy exists.'") (citation omitted); *Adams v. Jefferson Cnty. Dep't of Health*, No. 2:17-CV-01772-JEO, 2018 WL 3819834, at *11 (N.D. Ala.

---

[9] Though Taylor alludes to a pattern and/or practice of discrimination, the court notes he did not allege – and could not have alleged – a pattern and practice claim under Title VII.  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 967-68 (11th Cir. 2008), *abrogated on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (holding that a private litigant cannot maintain a pattern or practice claim unless he brings the claim as a class action and the court certifies a class).

Aug. 10, 2018) ("To be sure, Plaintiff's complaint includes a host of sweeping allegations that Henderson, Johnson, and other managers have a general pattern and practice of discriminating both against female employees who do not conform to gender stereotypes and against non-African Americans.  Those allegations, however, are set forth in vague and conclusory terms and contain insufficient facts from which reasonably to draw the invited inferences."); 10A CHARLES ALAN WRIGHT, ARTHUR MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2723 (4th ed. 2016) ("Nor can [a summary judgment] motion be defeated by factual assertions in the brief of the party opposing it, inasmuch as documents of this character are self-serving and are not probative evidence of the existence or nonexistence of any factual issues.") (footnotes omitted).   Furthermore, the allegations sporting some evidentiary foundation lack enough similarity to his situation to suggest an inference of discrimination.

First, Taylor asserts the "Agency has brought on a total of ten reemployed annuitants that I am currently aware of and all are white . . . ."  (Doc. 49, at 7, ¶ 21). Giunta testified he knew of six White reemployed annuitants working for the Agency, and two more White individuals who would soon begin working as reemployed annuitants.  (Doc. 48-3, at 15-18).  However, no evidence exists of the circumstances under which the Agency re-hired those annuitants, or whether the Agency denied interested Black retirees the opportunity for re-hire.

Second, Taylor asserts Defendant "has only moved black and brown skin individuals that were supervisors, which was two black females (Virginia Walker/Bridgett Helem), two black males (Dexter Hornsby/Earl Adam) and one woman (Cristina Rodriguez) of color that was moved while being investigated." [*sic*] (Doc. 49, at 9, ¶ 25).   However, Taylor did not provide the reasons for the investigations, other than the declaration the investigations of Adam and Rodriguez involved improper awards to subordinate employees.   He also identified another Black female employee whom Defendant placed on administrative leave during an investigation into allegations of downloading unauthorized files to a government computer.   (*Id.* at 11, ¶ 30).   However, he provides no record evidence to support this assertion.

Finally, Taylor states, "White supervisors have nearly twice the number of employees than African American's [*sic*]," and "[p]revious black Human Resources Chief (Earl Adam) had seven employees, his replacement a white female [*sic*] has thirteen employees with no differences in mission requirements."   (*Id.* at 6, ¶ 18).   He also recites anecdotal incidents of Black employes enduring unfair treatment, including negative reactions from supervisors when seeking information, and disregard or minimization of Black employees' complaints of unfair treatment.   (*Id.* at 10, ¶¶ 28-29). Again, he provides no record evidence to support any of these assertions.

28

Absent any additional evidence of discriminatory animus, a reasonable juror could not infer such animus from the mere fact Taylor, a Black employee, failed to receive resources he desired for his unit. *See Tynes*, 88 F.4th at 944 (prima facie case of discrimination requires more than just employee's membership in a protected class); *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020) ("[I]nferences in favor of a plaintiff can be based only on evidence — not on speculation. Because a jury in this case could find discrimination only on the basis of the latter, summary judgment was appropriate."); *Campbell v. Mayo Clinic Inc.*, No. 23-10966, 2024 WL 713921, at *2-3 (11th Cir. Feb. 21, 2024) (plaintiff's allegation a supervisor "was engaged in a suspicious, discriminatory campaign to find fault in her performance" did not present a convincing mosaic of discriminatory intent when no other circumstantial evidence of discrimination existed).

## B. Taylor Did Not Produce Sufficient Evidence of Race Discrimination Regarding the September 3, 2019, Detail Decision

Defendant argues Taylor cannot support a race discrimination claim based upon his September 3, 2019, detail because he presented no evidence of discriminatory intent. As with Taylor's denial of resource claims, he must satisfy the prima facie case standard for discrimination claims, *i.e.*, that he (1) "belongs to a protected class," (2) "was subjected to an adverse employment action," (3) "was qualified to perform the job in question," and (4) "[his] employer treated 'similarly situated' employees outside [his]

class more favorably." *Tynes*, 88 F.4th at 944 (cleaned up).  As this claim concerns Taylor's removal from a position, he can also satisfy the final element of the prima facie case by demonstrating his employer replaced him with someone outside his protected class.  *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (citing *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003); *McDonnell Douglas Corp.,* 411 U.S. at 802); *see also Cobb v. Floyd,* No. 21-10535, 2022 WL 856074, at *1 (11th Cir. Mar. 23, 2022) (quoting *Maynard,* 342 F.3d at 1286) (A plaintiff may "[a]lternatively . . . establish the fourth prong [of a *prima facie* case of discrimination] by showing [he] 'was replaced by a person outside [his] protected class.'"); *Cuddeback v. Fla. Bd. of Educ.,* 381 F.3d 1230, 1235 (11th Cir. 2004) (applying the alternative formulation of the fourth element of a *prima facie* case for a gender discrimination claim).

As with the denial of resources claim, this claim fails the prima facie case standard at the final element.[10]  Though Taylor stated Dale Aaknes, a White employee, replaced

---

[10] The court again notes Taylor belongs to a protected class because he asserts discrimination based upon his race, and the court can infer his qualification for the position from his six years of experience in the position.

A reasonable juror could conclude the September 3, 2019, detail constituted an adverse employment action.  Such actions typically require evidence of "a tangible adverse effect on the plaintiff's employment" and a "serious and material change in the terms, conditions, or privileges of employment." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).  An employee asserting a claim based upon reassignment within the same organization must establish that a reasonable person would prefer the formerly occupied position.  He

may do so with evidence of improved "wages, benefits, or rank," as well as other "serious and material change[s] in the terms, conditions, and privileges of employment," *id.* at 1033, such as the "prestige" of the position, *Hinson v. Clinch Cty.,*

him, the evidence, including other parts of Taylor's testimony, indicates Aaknes did not

constitute Taylor's immediate replacement.  Taylor testified John Landry, a Black male,

initially replaced Taylor.  Organizational charts confirm Landry replaced Taylor, and

Tangela Robinson, a Black female replaced Landry.  Aakes's name did not appear on

the organizational charts until September 2021, two years after the challenged detail.[11]

_____

*Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).

*Jefferson*, 891 F.3d at 921 (alteration in original).

        The loss of prestige associated with Taylor's move from a hard-walled office to a cubicle and the alteration of his supervisory duties would not, standing alone, represent a material change in the terms, conditions, or privileges of his employment.  *See Rousseau v. Alabama Cmty. Coll. Sys.*, No. 2:20-CV-391-RAH-SMD, 2021 WL 3476605, at *4 (M.D. Ala. Aug. 6, 2021) ("That Rousseau may have felt a subjective blow to his professional image, or suffered a subjective loss of perceived prestige, is not enough, standing alone, to demonstrate that he suffered an adverse employment action.").  But a permanently reduced salary constitutes such a material change, and Taylor testified his detail would reduce his future earning potential by capping his salary at a lower amount.  *See Alvarez v. Lakeland Area Mass Transit Dist.*, 406 F. Supp. 3d 1348, 1353-54 (M.D. Fla. 2019) (denial of a raise can constitute an adverse employment action).

[11] "[A] prima facie case is not wholly dependant upon meeting the fourth requirement of the *McDonnell Douglas* test," as "[a] plaintiff may have a prima facie case based on the first three requirements despite the fact that the employer hired a minority to fill the vacancy left by the plaintiff._*Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1534-35 (11th Cir. 1984)).  "[T]he court must consider whether the fact that a minority was hired overcomes the inference of discrimination otherwise created by the evidence presented by the plaintiff," considering such factors as "the length of time between the discharge and the replacement, whether the replacement by the hired minority occurred after the filing of an E.E.O.C. complaint, and, if the hired person had a history with the employer, whether it was a positive history." *Id.*  (citing *Howard,* 726 F.2d at 1535; *Jones v. Western Geophysical Co. of Am.*, 669 F.2d 280 (5th Cir. 1982)).  If the evidence demonstrates that "the filling of the vacancy by a minority was pretextual," the court may proceed based upon satisfaction of the first three elements of the prima facie case.  *Id.*; *see also Gibbons v. Cnty. Bd. of Educ. of Richmond Cnty.,* 454 F. App'x 720, 722 (11th Cir. 2011) (citing *Howard,* 726 F.2d at 1535; *Edwards,* 49 F.3d at 1521) (To circumvent the fourth element of the prima face, a plaintiff must present "evidence to establish that the decision to replace them with a person of the same race 'was a pretextual device specifically designed to disguise an act of discrimination.'").

No evidence exists of the timing of Taylor's replacement by Landry, or of Landry's employment

Taylor also cannot prove that similarly situated non-Black comparators received more favorable treatment.  He identified LaVanna Grantham and Tammy Williams, both White women, as comparators whom Defendant did not detail during investigations, but he did not provide evidence that either individual was similarly situated to him in all material respects.  The evidence does not depict whether Grantham and Williams occupied supervisory positions at the same level of authority as Taylor, or whether either individual shared a supervisor with Taylor.  Moreover, the investigations involving Grantham and Williams did not involve the same type of alleged misconduct as the investigation involving Taylor.  Defendant investigated Taylor for liability for property loss and falsification of property receipt documents, yet Grantham faced an allegation of nepotism, and there exists no evidence of the reason for the investigation of Williams.  *See Buckhanon v. Opelika Hous. Auth.*, No. 22-13689, 2024 WL 887038, at *2 (11th Cir. Mar. 1, 2024) (plaintiff did not identify similarly situated comparators when no employees she referenced had the same job title, responsibilities, or supervisor as she did, and none engaged in the same misconduct); *Burke*, 2023 WL 8841352, at *2-3 ("[N]one of Burke's alleged comparators are sufficiently similar because none engaged in the same basic misconduct at Burke.").

---

history with Defendant.  The existing evidence, as discussed fully throughout this opinion, does not give rise to an inference that Defendant replaced Taylor with Landry to disguise racially discriminatory motives, especially considering Defendant later replaced Landry with a Black Lieutenant Colonel, Tangela Robinson.

Taylor alluded to 12 White supervisors who underwent investigations that did not affect their job assignments.  However, he did not provide those individuals' names or any details about their positions or investigations.  Thus, no evidence exists those individuals were similarly situated to Taylor.

Taylor identified Jody Byrd, a White female who the Defendant did not detail to another assignment as she underwent multiple investigations for theft, as a comparator.  However, Byrd did not serve as a supervisor, as Taylor did, and no evidence exists about the work unit in which Byrd worked or the name of any of her supervisors.  *See Buckhanon*, 2024 WL 887038, at *2-3; *Burke*, 2023 WL 8841352, at *2-3.

No other convincing circumstantial evidence of race discrimination exists.  Taylor testified he primarily believed the September 3, 2019, detail decision resulted from race discrimination because Defendant continually set him up to fail by denying his requests for additional resources.  However, as previously discussed, no evidence exists racial animus influenced Defendant's alleged intentionally sabotage of Taylor's efforts.  Taylor also suggested Defendant's decision to move nine employees out of his work unit, then later move them back to the unit, indicates race discrimination.  (Doc. 44-4, at 5).  However, Taylor provided no details about those nine employees, and no evidence indicates discriminatory animus motivated Defendant's actions regarding those employees.

In summary, even if Taylor exhausted administrative remedies for all of his discrimination claims, he has not presented sufficient evidence to satisfy the prima facie case standard for race-based disparate treatment in either the denial of sufficient human resources or the September 3, 2019, detail decision. He also has not presented sufficient circumstantial evidence to present a convincing mosaic of race-based discrimination. Accordingly, the court will grant summary judgment in Defendant's favor on Taylor's race discrimination and disparate treatment claims.

## II. Taylor's Retaliation Claim Fails Because He Cannot Establish a Causal Connection Between His Protected Activity and Defendant's Adverse Employment Action

Title VII also protects federal employees from retaliation for engaging in protected conduct. *See Babb II*, 992 F.3d at 1203 (citation omitted) ("'[D]iscrimination,' as used in Title VII's federal-sector provision, by its own terms includes retaliation."). "[A]s with traditional race-based discrimination, if retaliation for engaging in a protected activity under Title VII taints the decision-making process for any personnel action, that violates the federal-sector provision – even if the employer would have made the same decision absent retaliation." *Buckley,* 97 F.4th at 798 (citing *Babb II*, 992 F.3d at 1202). Moreover, as with discrimination claims, "remedies must match the injury. So remedies for a retaliation violation that tainted the decision-making process but were not a but-for cause of personnel action are limited just like they are for the analogous types of race-discrimination violations . . . ." *Id.*

To prove a retaliation claim, a federal employee must satisfy "a variation on the *McDonnell Douglas* framework." *Id.* Under that framework, he

> may establish a prima facie case of retaliation by showing (1) []he participated in an activity that Title VII protects; (2) []he suffered an adverse personnel action; and (3) a causal relationship exists between [his] protected activity and the adverse personnel action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). If the plaintiff makes out a prima facie case, the burden falls on the employer to state a legitimate, non-retaliatory reason for the challenged personnel action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the employer satisfies that burden, the plaintiff must carry the ultimate burden of proving that the employer's stated reason is pretext for retaliation. *Id.*
>
> So just as with the traditional *McDonnell Douglas* framework for evaluating circumstantial race-discrimination claims, our prior framework for assessing retaliation claims requires a plaintiff to prove that [his] employer wouldn't have undertaken the challenged personnel action against her but for its retaliatory motive. But as we've explained, retaliation in the decision-making process – even if it didn't affect the ultimate decision – still violates § 2000e-16(a).
>
> So after *Babb I* and *Babb II*, in analyzing [a federal employee's] retaliation claim, we instead consider whether [the employee] has submitted evidence that would allow a reasonable jury to find that retaliation "play[ed] *any* part" in the Secretary's decision-making process . . . . *Babb I*, 140 S. Ct. at 1174 (emphasis added).

*Buckley*, 97 F.4th at 798.

Defendant does not dispute Taylor produced evidence bearing upon the first two elements of a prima facie case. Taylor engaged in protected activity when he gave statements supporting other employees' race discrimination claims against two supervisors, Weirick and Mayes. He claims that, in retaliation for those statements,

Defendant continued to deprive him of adequate resources to perform the requirements of his job, thereby setting him up to fail, and detailed him to a Strategic Planning Officer position on September 3, 2019.  Such actions represent adverse employment actions as they could dissuade a reasonable worker from participating in protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 70-71 (2006) (reassignment of job duties may constitute an adverse employment action if it results in more arduous or less desirable duties or a loss of prestige); *Moore v. City of Homewood*, No. 21-11378, 2023 WL 129423, at *12 (11th Cir. Jan. 9, 2023) (imposing a burdensome schedule may constitute an adverse employment action for a retaliation claim); *Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 952 (11th Cir. 2015) (citing *Crawford,* 529 F.3d at 974) (receipt of unfavorable performance review that affects eligibility for a pay raise may constitute an adverse employment action for a retaliation claim).[12]

However, Defendant argues Taylor has presented no evidence of a causal

---

[12] Taylor's Complaint may have included a claim for a retaliatory hostile work environment, in addition to claims for retaliation based upon discrete acts.  (*See* Doc. 1-2, at 13-14, ¶ 50) ("Under Title VII, the Plaintiff was harassed which included a quid pro quo harassment and hostile work environment and the Defendant knew and took no steps of action to correct the harmful act after being notified by the Plaintiff supervisor.").  In his deposition, Taylor appears to have disclaimed a retaliatory hostile work environment claim, stating instead that the discrete actions of assignment of resources and the September 3, 2019, detail decision, constituted unlawful retaliation.  (Doc. 44-4, at 13-14).  However, even if Taylor pursues a retaliatory hostile work environment claim, such a claim, like a discrete action retaliation claim, requires evidence of causation, which Taylor has not produced.  *See Terrell,* 98 F.4th at 1356 (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)) (court should assess whether a plaintiff suffered a hostile work environment because of protected activity).

connection between his protected activity and Defendant's alleged adverse employment actions.

> The causal-connection requirement mandates a showing that "the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (internal quotation marks omitted), *abrogated on other grounds by Burlington*, 548 U.S. 53, 126 S. Ct. 2405.  But a retaliation claim must reflect actual, subjective — not constructive — discrimination; thus, [a plaintiff must] present evidence that would allow a jury to find that "the decision-makers were aware of the protected conduct." *Id.* (alterations adopted) (internal quotation marks omitted).

*Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 783 (11th Cir. 2024).

The record contains no evidence that Col. Trimble – who initiated and signed the form for the September 3, 2019, detail – or Joseph Giunta – who Taylor agrees made final the detail decision – had any knowledge of Taylor's participation in the 2018 and 2019 investigations of Weirick and Mayes.   Taylor acknowledged he did not know if Giunta read or knew about his statements to the investigator, and he presented no information about Trimble's knowledge of the investigation.

Taylor has not argued that either Giunta or Trimble acted as a "cat's paw" for any retaliatory intent harbored by Weirick, Mayes, or any other supervisor with knowledge of Taylor's protected activity.[13]  However, even if he had advanced such an

---

[13] Under a cat's paw theory of discrimination or retaliation, "causation may be established when a decisionmaker followed a biased non-decisionmaker's recommendation without independently investigating the basis for the complaint."   *Matamoros v. Broward Sheriff's Off.,* 2 F.4th 1329, 1336 (11th Cir. 2021).   "In such a case, the recommender is using the decisionmaker as a conduit, or a 'cat's paw,' to give effect to the recommender's own discriminatory animus."   *Id.* (citing *Stimpson v. City of*

argument, there exists no evidence either Weirick, Mayes, or any other supervisor, knew about Taylor's participation in the investigations.  Taylor only speculates that Weirick and Mayes must have read his statements because no other explanation exists for their subsequent behavior, and he believes most people would want to know if another person took action against them.

"'Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'"  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original) (quoting *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 931-32 (7th Cir. 1995)).  Resultingly, the Eleventh Circuit has ruled that an employee's speculation that a decisionmaker knew of his protected conduct did not constitute evidence of causation for a retaliation claim.  *Copeland*, 97 F.4th at 783; *see also Moss v. St. Vincent's Health Sys.*, No. 22-13956, 2024 WL 729953, at *4 (11th Cir. Feb. 22, 2024) (citing *Martin*, 959 F.3d at 1054) ("An argument that the decisionmaker must have known about the protected activity is too speculative because evidence that she could have known about it is not the same as evidence that she did."); *Bell v. Sec'y, Dep't of Veterans Affs.*, No. 22-12698, 2024 WL 1462405, at *7 (11th Cir. Apr. 4, 2024) ("Bell speculates that Nurse Executive Doloresco probably told Dr. Leland about this activity, or that Doloresco otherwise had a hand in these decisions apart from

_____

*Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)).

simply signing off on Rochon's denial of LWOP, but such speculation is insufficient to defeat summary judgment."); *Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614, at *3 (11th Cir. Jan. 4, 2022) (rejecting an argument that "no other legitimate reason for the reassignment existed" as establishing causation for a retaliation claim).

Absent any evidence that a decisionmaker knew of his protected activity, Taylor cannot establish a prima facie case of retaliation. He also presents no other evidence to form a convincing mosaic of retaliatory intent. *See Copeland* 97 F.4th at 783 (citing *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311-12 (11th Cir. 2023)) ("A plaintiff relying on circumstantial evidence of retaliatory intent also may survive summary judgment by presenting evidence of a convincing mosaic of circumstantial evidence that would allow the jury to infer intentional retaliation by the employer. . . . Given that Copeland could not identify the decisionmakers who decided not to promote him and had no evidence about whether those decisionmakers knew of his protected conduct, we cannot say that he came forward with sufficient evidence to survive summary judgment under a convincing-mosaic theory.").

As Taylor cannot demonstrate retaliation played any part in the decisions to deny him adequate human resources and detail him to a different position on September 3, 2019, the court must grant summary judgment in Defendant's favor on Taylor's retaliation claim.

## CONCLUSION

In accordance with the foregoing analyses, the court will grant Defendant's motion for summary judgment and enter judgment in Defendant's favor on all of Plaintiff's claims.  The court will enter a separate final judgment.

**DONE** this 8th day of July, 2024.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE